# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# VALDOSTA DIVISION

KATHRYN HARRIS,                          :
                                         :
    Plaintiff,                           :
                                         :
v.                                       :        Civil Action No. 7:07-cv-46(HL)
                                         :
CITY OF VALDOSTA, GEORGIA,               :
and JOHN FRETTI, Individually,           :
and in his Official Capacity as          :
Mayor of the City of Valdosta,           :
                                         :
    Defendants.                          :
_____

# ORDER

This matter is before the Court on Defendants' The City of Valdosta, Georgia and

John Fretti's Motion for Summary Judgment (hereinafter collectively the "Defendants").

(Doc. 14).  The Motion has been fully briefed by the parties and is ripe for adjudication.[1]

Defendants contend that they are entitled to judgment as a matter of law on all

of Plaintiffs' claims, and that there are no material issues of fact remaining in this case.

After review of the motion and briefs, the affidavits and documents filed in support, and

---

[1] Local Rule 56 requires the respondent to attach a separate and concise statement of material facts, numbered separately, to which the respondent contends there exists a genuine issue to be tried.  Plaintiffs failed to attach the required statement to their response.

The Court further notes that both parties failed to provide record citations for several of the material facts contained in Defendants' Statement of Material Facts to Which There is No Genuine Issue and Plaintiffs' Response to the same.

the pleadings and discovery materials on file, the Court grants Defendants' Motion for Summary Judgment.

## I.    BACKGROUND

This lawsuit arises from a series of events that occurred at a Valdosta City Council (hereinafter the "Council") meeting held on May 5, 2005.  On April 27, 2007, Plaintiff Kathryn Harris filed her complaint in the Superior Court of Lowndes County, Georgia.  Twelve other virtually identical lawsuits were also filed in the Lowndes County Superior Court on the same date.  After filing answers in all thirteen cases, Defendants removed the cases to this Court on May 30, 2007.  The Court subsequently consolidated the cases for discovery purposes, designating this as the lead case.[2]

## II.   FACTS

A park formerly known as Barber Park (hereinafter the "Park") is located in the City of Valdosta, Georgia (hereinafter the "City").  The Park was originally owned by and named after E.R. Barber, who operated the Park in a segregated fashion.  The City purchased the Park in or around 1974.  After extensive renovations in 2003 and 2004, a movement ensued to rename the Park after an African-American.  Barber Park is located in a predominantly African-American neighborhood.

---

[2]In its Order consolidating the thirteen removed cases, the Court instructed the parties that where the issues raised in a motion are applicable to all thirteen cases, rather than filing thirteen motions, the parties should file one motion in the lead case.  Defendants' Motion appears to be applicable to all thirteen cases, and the Court's decision will similarly apply to each case.

The People's Tribunal, a local civil rights organization, spearheaded a movement to change the name of Barber Park.  Plaintiff Floyd Rose was president of the People's Tribunal during the time period in question.  The issue of appointing a committee to address the possible renaming of the Park was initially brought before the Council on February 24, 2005.

The Council consists of seven individuals, with six elected from districts and one at-large councilmember.  It meets every other week on Thursday evenings at 5:30 p.m.  The mayor is charged with the duty to preside over the meetings, which generally consist of the following format:  (1) Opening Ceremonies; (2) Awards and Presentations; (3)  Consideration of Approval of Minutes; (4) Citizens to be Heard; (5) Public Hearings; (6) Ordinances and Resolutions; (7) Bids, Contracts, Agreements, and Expenditures; (8) Local Funding and Requests; (9) Boards, Commissions, and Authorities; (10) City Manager's Report; (11) Council Comments; and (12) Adjournment.

The Council's meetings are governed by <u>Robert's Rules of Order</u>, as well as the "Policy Procedures and Guidelines of Valdosta City Council" (hereinafter the "Policy"), which was adopted on February 21, 1985.  The Policy provides as follows:

> (1)     The City Manager determines what is on the agenda;

> (2)     Items not on the agenda will not be voted on unless they are of an emergency nature;

> (3)     Issues raised during the Citizens to be Heard portion of the meeting cannot be voted on;

(4)    Citizen comments should be brief so everyone has adequate time to express his viewpoint;

(5)    Citizen comments should be made to Council as a whole, and individual attacks and cross examination of Councilmembers or City employees are not allowed; and

(6)    Once an official vote is taken on any item, the matter cannot be reconsidered for a period of six months without a two-thirds vote of Councilmembers present, excepting matters involved in litigation.

If the Mayor or Councilmembers have an item they wish to have put on the agenda, they make a request to the City Manager.  In most cases, if a member of Council asks for an item to be placed on the agenda, it will be so placed.  Agendas are provided to the Mayor, Councilmembers, and the press the week prior to the scheduled meeting. If an agenda is amended, it is given to the Mayor, Councilmembers, and the press at least 24 hours prior to the meeting.

Councilman Sonny Vickers requested that the issue of forming a committee to study the idea of renaming Barber Park be placed on the agenda for the February 24, 2005 Council meeting.  A motion was made at the meeting for the formation of a committee, but the motion died for lack of a second.  After the vote was taken,  Plaintiff Rose approached the podium and stated his disapproval of the Council's actions. Defendant Mayor John Fretti (hereinafter "Mayor Fretti") asked Plaintiff Rose several times to take a seat because Plaintiff was speaking during the business portion of the meeting.  When Plaintiff Rose refused to sit down, a police officer spoke to Plaintiff

Rose, and he left the Council chambers.[3]  Mayor Fretti did not instruct the police to take any action with regard to Plaintiff Rose.[4]

The renaming of the Park was next addressed at the Council's April 21, 2005 meeting.[5]  Councilman Vickers, who again requested that the Park issue be placed on the agenda, initially addressed the Council.  (Audio recording:  April 21, 2005 Valdosta City Council meeting, minute 40:32).  Mayor Fretti then opened the request for discussion.  (April 21, 2005 meeting recording, minute 40:53).  Councilman Vickers did not immediately make a motion on the Park issue because he wanted to see what kind of discussion the Council had before he made the motion.  (April 21, 2005 meeting recording, minute 41:43).

Councilmen J.R. Sessions, Robert Yost, and Sonny Vickers took the opportunity to speak on the issue.  Both Councilman Sessions and Councilman Yost expressed their opposition to renaming the Park.  (April 21, 2005 meeting recording, minutes 42:39, 48:40)  Mayor Fretti stated that the Council first had to determine whether to allow the renaming of Barber Park, and then the subject of appointing a committee to

---

[3]No charges were filed against Plaintiff Rose as a result of his conduct at the February 24, 2005 meeting.

[4]Plaintiffs contend that there is a disputed issue of fact as to the events that transpired at the February 24, 2005 meeting, but do not provide the Court with any record citations to, or evidence of, their version of what happened.  Mayor Fretti's deposition provides support for Defendants' version of events.

[5] The Court has been provided with an audio recording from that meeting, along with the minutes.

study the idea would be addressed.  (April 21, 2005 meeting recording, minute 44:35).

He noted that the issue of the appointment of a committee was raised at a Council

meeting just two months earlier.  Usually such an item could not be reconsidered within

six months after a vote without a super majority.  The Council could consider a new

motion on the Park issue at the April meeting, however, because the motion was never

voted on during the February 24, 2005 meeting, as it died for lack of a second.  (April

21, 2005 meeting recording, minute 45:00).

A motion was made by Councilman Vickers to rename Barber Park, but it was

voted down 2 to 3.  (April 21, 2005 meeting recording, minute 49:18).  The appointment

of a committee was not further addressed.  After the vote was taken, and after Mayor

Fretti attempted to move forward on the agenda, Plaintiff Rose approached the podium

to ask for clarification about the vote.  (April 21, 2005 meeting recording, minute 49:55).

Mayor Fretti told Plaintiff Rose that the motion was denied.  (April 21, 2005 meeting

recording, minute 50:02).  The Mayor reminded Plaintiff Rose that it was not a public

hearing, to which Plaintiff Rose replied, "I must remind you that I have something to

say."  (April 21, 2005 meeting recording, minute 50:18).  Councilman Vickers told

Plaintiff Rose, "Don't do that," and "I wish you wouldn't."  (April 21, 2005 meeting

recording, minute 50:22).  Plaintiff Rose made additional comments about why the Park

should be renamed.  (April 21, 2005 meeting recording, minute 50:28).  Mayor Fretti

told Plaintiff Rose that he could try to raise the issue again, and a Councilmember

noted that he could do so in six months.  Mayor Fretti asked Plaintiff Rose to call him

the next day, and he would answer any questions Plaintiff Rose had.  (April 21, 2005 meeting recording, minute 50:57).  Plaintiff Rose said that he would not call Mayor Fretti, but the Mayor could write him a letter.  (April 21, 2005 meeting recording, minute 51:10).

Plaintiff Rose continued speaking and asked for members of the audience who were in support of the name change to stand.  (April 21, 2005 meeting recording, minute 51:20).  Mayor Fretti then asked Plaintiff Rose to leave the podium.  (April 21, 2005 meeting recording, minute 51:26).  Plaintiff Rose refused, stating, "I will not do that.  I will if you arrest me but I will not move unless I am under arrest."  (April 21, 2005 meeting recording, minute 51:28).  When asked how long he intended to stand, Plaintiff Rose stated, "If I am under arrest, we'll all go - - we'll all go but until  - - if we're not under arrest, then we'll just stand here."  (April 21, 2005 meeting recording, minute 51:51).

Mayor Fretti then recessed the meeting, and asked that Plaintiff Rose "politely, politely let [Council] go on with our meeting."  (April 21, 2005 meeting recording, minute 52:42).  Councilman Vickers and Commander John Fason of the Valdosta Police Department approached Plaintiff Rose and asked him to leave the podium.  It is undisputed that Plaintiff Rose refused.  After the Council was called back into session, Mayor Fretti asked the crowd to disperse.  (April 21, 2005 meeting recording, minute 53:02).  To this, Plaintiff Rose replied, "We - - we will not move."  (April 21, 2005 meeting recording, minute 53:10).  Plaintiff Rose and Plaintiff Willie Head were

7

subsequently escorted out of the meeting by members of the Valdosta Police Department, and were taken to the Lowndes County Jail.  Plaintiffs Rose and Head were charged with a violation of O.C.G.A. § 16-11-34, disturbance of meeting, gathering, or procession.  Plaintiffs were released on their own recognizance.[6]

An article about the April 21st meeting appeared in the April 22, 2005 edition of the Valdosta Daily Times.  Mayor Fretti is quoted in the article as saying, with regard to the attempted renaming of the Park, "There was no finality in the vote.  Anyone can continue to push any issue at any time.  Every council meeting is an opportunity to bring an issue to attention during citizens to be heard or to pursue an issue for the addition on the agenda."  (Dep. of John Fretti, Pl. Exh. 3).

The next Council meeting was scheduled for May 5, 2005.  The People's Tribunal held a meeting after the April 21st Council meeting, during which the tribunal members made plans to attend the May 5th Council meeting.  With the exception of Plaintiff Reggie Griffin, all Plaintiffs were aware that Plaintiffs Rose and Head had been arrested at the April 21st Council meeting.  It is disputed as to whether Plaintiff Rose informed members of the Valdosta Police Department that the People's Tribunal planned an act of civil disobedience at the May 5th meeting.

The issue of renaming Barber Park was not on the Council's agenda for the May 5th meeting.  Prior to the Citizens to be Heard portion of the meeting, which allows

---

[6]Plaintiffs Rose and Head are not asserting any claims arising from their removal and arrest at the April 21, 2005 Council meeting.

citizens to speak on non-public meeting agenda items, Mayor Fretti instructed the audience to keep their comments concise and brief and to engage the Council as a whole rather than engaging a single Councilmember in debate.[7] (Audio recording: May 5, 2005 Valdosta City Council meeting, disc 1, minute 14:10).

Several people spoke about the renaming issue during Citizens to be Heard, even though the item was not on the agenda. Plaintiffs Jesse Clark, Leigh Touchton, and Willie Head, who each spoke in favor of renaming the Park, were allowed to speak at length without any intervention or comment from Mayor Fretti or the Council. (May 5, 2005 meeting audio recording, disc 1, minutes 18:51, 34:42, and 43:30; video recording, minutes 0:01, 14:50). Mr. Ari Santas, who is not a party to this case, also spoke about the Park issue. (May 5, 2005 meeting audio recording, disc 1, minute 29:38; video recording, minute 9:55). By the Court's calculation, Plaintiff Clark spoke for ten minutes and 37 seconds, Plaintiff Touchton spoke for five minutes and 23 seconds, Plaintiff Head spoke for five minutes and 48 seconds, and Mr. Santas spoke for four minutes and 23 seconds, all about the Park.

Plaintiff Rose then approached the podium and spoke about renaming the Park. (May 5, 2005 meeting audio recording, disc 1, minute 49:38; video recording, minute 20:32). He requested that the issue of forming a committee to investigate the renaming of Barber Park be placed on the agenda that night. (May 5, 2005 meeting audio

---

[7]The Court has been provided with video and audio recordings of the May 5, 2005 Council meeting.

9

recording, disc 1, minute 50:00; video recording, minute 20:48).  Mayor Fretti reminded Plaintiff Rose that the issue was not on the agenda for the meeting, and noted that a request to put an item on the agenda could be made by a Councilmember, but none had done so with this issue.  (May 5, 2005 meeting audio recording, disc 1, minute 50:44; video recording, minute 21:32).  Plaintiff Rose referenced Mayor Fretti's quote in the Valdosta Daily Times where he said any citizen at any time could ask for an item to be placed on the agenda, and said that is what he was doing.  (May 5, 2005 meeting audio recording, disc 1, minute 51:17, video recording, minute 22:03).  Mayor Fretti stated that the quote was incorrect, and that any citizen can ask a Councilmember to put an item on an upcoming agenda, but that once the agenda is set, "It is pretty well set."  (May 5, 2005 meeting audio recording, disc 1, minute 51:40; video recording, minute 22:24).

Plaintiff Rose then inquired if he could ask a member of the Council to make a recommendation to have the renaming issue placed on the agenda.  (May 5, 2005 meeting audio recording, disc 1, minute 51:58; video recording, minute 22:43).  Mayor Fretti reminded Plaintiff Rose that the Council had to abide by certain rules and he would have to determine if any motions made at the meeting were in line with the Council's procedures.  (May 5, 2005 meeting audio recording, disc 1, minute 52:05; video recording, minute 22:50).  Plaintiff Rose responded that he was going to ask one of the Councilmembers to make the motion.  (May 5, 2005 meeting audio recording, disc 1, minute 52:31; video recording, minute 23:16).  Councilman Vickers reminded

Mayor Fretti that a super majority of five votes might be required to place the Park issue on the agenda since it had been voted on once within the previous six months. (May 5, 2005 meeting audio recording, disc 1, minute 52:35; video recording, minute 23:20).  Councilman Vickers said that he was not prepared to discuss the committee idea that night.  (May 5, 2005 meeting audio recording, disc 1, minute 52:58; video recording, minute 23:43).  Mayor Fretti stated that one Councilmember expressed that he was unwilling to move forward with the issue that night, and said again that the agenda was "pretty well set."  (May 5, 2005 meeting audio recording, disc 1, minute 53:40; video recording, minute 24:22).

Plaintiff Rose responded, "We have a problem then," and said he wanted the Council to say it would appoint a committee or give a date by which it would appoint a committee.  (May 5, 2005 meeting audio recording, disc 1, minute 53:59, video recording, minute 24:40).  Plaintiff Rose told the Council that if it refused to do so that night, "We are just going to be in problems from now on."  (May 5, 2005 meeting audio recording, disc 1, minute 54:22; video recording, minute 25:03).  Mayor Fretti again said that if the item was on the agenda or if any Councilmember put it on the agenda, the Council could address it, but the issue was not on the agenda.  (May 5, 2005 meeting audio recording, disc 1, minute 54:30; video recording, minute 25:10).  Plaintiff Rose then asked Councilman James Wright to make a motion to place the issue of the appointment of a committee on the agenda.  (May 5, 2005 meeting audio recording, disc 1, minute 54:39; video recording, minute 25:19).  Mayor Fretti notified Plaintiff

11

Rose that he was going against the Mayor's instructions, and after reminding Plaintiff Rose that the Council operated pursuant to policies and procedures dictating the conduct of the meeting, the Mayor asked if Plaintiff Rose would honor those policies and procedures. (May 5, 2005 meeting audio recording, disc 1, minute 55:04; video recording, minute 25:43). In response, Plaintiff Rose said, "I can't, not tonight, I will not." (May 5, 2005 meeting audio recording, disc 1, minute 55:34; video recording, minute 26:13). Councilman Wright did not move to add the item to the agenda.

Mayor Fretti then declared an impasse, again stating that the issue was not on that night's agenda. (May 5, 2005 meeting audio recording, disc 1, minute 55:40; video recording, minute 26:18). Plaintiff Rose responded by saying, "You do what you have to do and then we will have to do what we have to do." (May 5, 2005 meeting audio recording, disc 1, minute 55:46; video recording, minute 26:24). He then demanded, "Why don't you just go ahead tonight and tell us that you are going to do a committee." (May 5, 2005 meeting audio recording, disc 1, minute 56:36; video recording, minute 27:13). Mayor Fretti stated that he wanted to see if any other citizens had an issue on which they wished to speak. (May 5, 2005 meeting audio recording, disc 1, minute 56:44; video recording, minute 27:20). He then asked Plaintiff Rose to relinquish the podium so other persons could speak during the Citizens to be Heard portion of the Council meeting, stating, "There may be some folks who have to tell me about a dangerous dog in their neighborhood or something like that." (May 5, 2005 meeting audio recording, disc 1, minute 56:50; video recording, minute 27:28). After Mayor

12

Fretti asked if Plaintiff Rose would allow him to continue with Citizens to be Heard, Plaintiff Rose responded, "I will not move." (May 5, 2005 meeting audio recording, disc 1, minute 57:00; video recording, minute 27:35). The remaining Plaintiffs approached the podium after Mayor Fretti initially asked Plaintiff Rose to step aside. (May 5, 2005 meeting video recording, minute 27:35). Plaintiffs interpreted Mayor Fretti's statement to mean that the Mayor viewed their issue as being no more important than a stray dog.

At that time, Plaintiff Rose realized that he might be arrested if he remained at the podium. Mayor Fretti again asked Plaintiff Rose to move from the podium so he could continue with the agenda, to which Plaintiff Rose replied, "I will not," and "Do whatever you have to do." (May 5, 2005 meeting audio recording, disc 1, minute 57:10; video recording, minute 27:47). Mayor Fretti expressed understanding that Plaintiff Rose wanted the Park issue placed on the agenda, and asked if there were any other terms. (May 5, 2005 meeting audio recording, disc 1, minute 57:20; video recording, minute 27:56). Plaintiff Rose told the Mayor that he wanted the issue of having a committee appointed put on the meeting agenda that night, or in the alternative, he wanted the Mayor to tell him a date by which the Mayor would appoint a committee. (May 5, 2005 meeting audio recording, disc 1, minute 57:28; video recording, minute 28:00).

Mayor Fretti again requested that Plaintiff Rose leave the podium so the meeting could move forward. (May 5, 2005 meeting audio recording, disc 1, minute 57:40; video recording, minute 28:16). Whether Mayor Fretti requested that the other Plaintiffs

leave the podium is disputed.  Plaintiff Rose told the Mayor, "We will not move; you do whatever you have to do."  (May 5, 2005 meeting audio recording, disc 1, minute 57:49; video recording, minute 28:24).  Mayor Fretti stated that Plaintiff Rose chose not to relinquish the podium and that the Council did not have any choice but to have Chief Charles Simons of the Valdosta Police Department clear the Council chambers.  (May 5, 2005 meeting audio recording, disc 1, minute 58:00; video recording, minute 28:33).  Mayor Fretti asked the Council if they had any objection to having Chief Simons clear the chambers.  (May 5, 2005 meeting audio recording, disc 1, minute 58:15; video recording, minute 28:50).  There was no objection, and Mayor Fretti stated, "It is unanimous that we allow Chief Simons to, see fit necessary, as he deems, to help us clear the chamber so we can continue with our agenda."  (May 5, 2005 meeting audio recording, disc 1, minute 58:25; video recording, minute 28:57).  Commander Fason then told Plaintiff Rose that there was an easier way to get his point across, and if the group relinquished the podium, no one would be arrested.  Plaintiff Rose again refused to move.  Commander Fason told Plaintiffs that since they would not leave, "You leave us no other choice than to place you all under arrest.  We will take you out one at a time."  (May 5, 2005 meeting audio recording, disc 1, minute 59:05; video recording, minute 29:35).

At that time, Commander Fason said, "Anyone who wants to be arrested just follow me."  (May 5, 2005 meeting audio recording, disc 1, minute 59:18; video recording, minute 29:50).  He then left the chambers with Plaintiffs and other individuals

following him.  Plaintiffs contend that the statement was a joke, and that they were already under arrest and proceeding out of the chambers.  After leaving the chambers, some members of the group began singing "We Shall Overcome."  (May 5, 2005 meeting audio recording, disc 1, minute 59:29).

There is a dispute as to what happened after Plaintiffs and the remainder of the group left the Council chambers.  Defendants contend that some members of the group declined to be arrested and were allowed to leave.  Plaintiffs state that they, the thirteen people standing at the front of the Council chambers, were placed under arrest and were never given the option to leave.  Plaintiffs were placed in police vans and transported to the Lowndes County Jail, where they were held for more than 24 hours before being released on bond.

After Plaintiffs were removed from the Council chambers, the meeting resumed. During the remainder of Citizens to be Heard, two other people spoke in favor of renaming Barber Park, one of whom inquired of the Council the proper way to request that an item be placed on the agenda.  (May 5, 2005 meeting audio recording, disc 2, minutes 1:08, 23:46).  Instructions were provided by Mayor Fretti and the Council. (May 5, 2005 meeting audio recording, minute 1:37).  The Council went on to consider other issues, including zoning requests and bid requests.  Public hearings on zoning requests are held only during the first Council meeting of the month, which was the May 5th meeting, and had been advertised to occur at that meeting.

Warrants were subsequently issued for fifteen people, including Plaintiffs, for violating O.C.G.A. § 16-11-34.  These warrants were signed by Lowndes County Magistrate Judge Joni Parker.  The prosecutions took place in the State Court of Lowndes County, where Plaintiffs filed a motion to dismiss alleging that § 16-11-34 was unconstitutional.

On August 4, 2005, a hearing was held before the Honorable Kelly Turner, Lowndes County State Court Judge.  Judge Turner issued an order on August 25, 2005 declaring § 16-11-34 unconstitutionally vague and overbroad.

Judge Turner's decision was appealed to the Georgia Supreme Court.  The statute was ultimately struck down as being unconstitutionally overbroad.  The Georgia Supreme Court rejected the vagueness argument.  As a result of the Supreme Court's decision, on May 11, 2006, the Lowndes County State Court Solicitor issued a Nolle Prosequi in the pending cases against Plaintiffs.

On May 25, 2006, the Council voted to appoint a committee to investigate whether the Park should be renamed.  On November 9, 2006, the Council voted to change the name of Barber Park to John W. Saunders Memorial Park, after the first African-American agricultural extension agent in Lowndes County.

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

16

Fed.R.Civ.P. 56(c).  The moving party has the initial burden of informing the Court of the basis for the motion and showing that there is no genuine issue of material fact by "identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986).  If the non-moving party will bear the burden of proving the material issue at trial, then in order to defeat summary judgment, he must respond by going beyond the pleadings, and by his own affidavits, or by the discovery on file, identify facts sufficient to establish the existence of a genuine issue for trial. See id. at 322, 324.

A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-250 (internal citations omitted). It is not the court's function at the summary judgment stage to determine credibility or decide the truth of the matter.  Id. at 249. Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor."  Id. at 255.

Furthermore, "[a] nonmoving party, opposing a motion for summary judgment supported by affidavits[,] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would

17

be inadmissible at trial." <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir.1991) (citation omitted), <i>cert. denied</i>, 506 U.S. 952, 113 S.Ct. 405 (1992).  The evidence "cannot consist of conclusory allegations or legal conclusions." <u>Id.</u> (citation omitted). Unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment.  <i>See</i> <u>Midwestern Waffles, Inc. v. Waffle House, Inc.</u>, 734 F.2d 705, 714 (11th Cir.1984).

**IV.   DISCUSSION**

   **A.   42 U.S.C. § 1983 Claims**

      **1.   First Amendment**

Plaintiffs bring a claim pursuant to 42 U.S.C. § 1983, contending that Defendants violated their First Amendment right to freedom of expression.  To establish a claim under § 1983, a plaintiff must prove that (1) a person, (2) acting under color of state law, (3) deprived the plaintiff of a federal right.  42 U.S.C. § 1983.

The Supreme Court has established that the First Amendment does not guarantee persons the right to communicate their views "at all times and places or in any manner that may be desired." <u>Heffron v. Int'l Soc'y for Krishna Consciousness</u>, 452 U.S. 640, 647, 101 S.Ct. 2559 (1981).  The imposition of different levels and kinds of restrictions on speech are permitted, and depend on the type of government property on which the speech occurred.

City commission meetings are one forum where speech may be restricted to a specified subject matter.  In other words, city commission meetings are "limited" public

fora - - i.e., "a forum for certain groups of speakers or for the discussion of certain subjects." Rowe v. City of Cocoa, Florida, 358 F.3d 800, 802 (11th Cir.2004), *quoting* Crowder v. Housing Auth. of City of Atlanta, 990 F.2d 586, 591 (11th Cir.1993); Cleveland v. City of Cocoa Beach, Florida, 221 Fed.Appx. 875 (11th Cir.2007). "The government may restrict access to limited public fora by content-neutral conditions for the time, place, and manner of access, all of which must be narrowly tailored to serve a significant government interest." Crowder, 990 F.2d at 591, *citing* Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 460 U.S. 37, 45, 103 S.Ct. 948 (1983).

### a.    Content neutrality

The restriction of speech is content-neutral if it is "justified without reference to the content of the regulated speech." Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 295, 104 S.Ct. 3065 (1984). In determining whether a restriction is content-neutral, the Court's "controlling consideration" is the purpose in limiting the Plaintiffs' speech in a public forum. Jones v. Heyman, 888 F.2d 1328, 1331-1332 (11th Cir.1989). As long as a restriction "serves purposes unrelated to the content of expression," it is content-neutral "even if it has an incidental effect upon some speakers or messages but not others." Ward v. Rock Against Racism, 491 U.S. 781, 791, 109 S.Ct. 2746 (1989). A content-neutral restriction is one that does not restrict "either a particular viewpoint or any subject matter that may be discussed." Solantic, LLC v. City of Neptune Beach, 410 F.3d 1250, 1259 (11th Cir.2005) (citations omitted).

19

Plaintiffs contend that there is a disputed question of material fact as to whether they were arrested and prosecuted based on their views or Mayor Fretti's need to preserve order.  Put differently, Plaintiffs contend that Defendants' actions were content-based, rather than content-neutral.  The Court disagrees with Plaintiffs. Applying the above-referenced standards, the Court finds that Defendants' actions were not based on disapproval of Plaintiffs' message or viewpoint.  Instead, it appears that Defendants' actions resulted from Plaintiffs' disruptive conduct and failure to abide by proper procedural rules.  The Court cannot overlook the fact that numerous persons, including several Plaintiffs, were allowed to speak at length on the renaming issue both before and after Plaintiffs were escorted from the Council chambers, even though the issue was not on the agenda.  It does not appear that there was any animosity on the part of Mayor Fretti or the Councilmembers towards the Park issue.  Thus, Defendants' actions were content-neutral.

Plaintiffs argue fervently based on <u>Monteiro v. City of Elizabeth</u>, 436 F.3d 397 (3rd Cir.2006), that there is a jury issue on their First Amendment claim because genuine issues of material fact exist as to whether Mayor Fretti acted with a motive to suppress Plaintiffs' speech based on their viewpoint.  The Court finds <u>Monteiro</u> inapposite to the case at bar.

The plaintiff in <u>Monteiro</u> was a member of the Elizabeth City Council, who, at a council meeting, expressed his objections to the city's proposed annual budget.  After other councilmembers spoke on the issue, defendant Perkins-Auguste, the council

president and officer in charge of presiding over the meeting, began to speak and "immediately leveled a pointed attack at Monteiro for what she perceived to be his role in the distribution of a pamphlet protesting the budget and inviting citizens to attend the meeting." Id. at 400.  When Monteiro attempted to defend himself, Perkins-Auguste ruled him out of order, pounded her gavel, and asked two municipal officers to remove Monteiro from the meeting.  Id. at 400-401.  Perkins-Auguste continued her remarks, saying, among other things, "This is disgusting....Do not lie.  It's beyond deception." Id. at 401.  Monteiro briefly responded to Perkins-Auguste, who exclaimed:  "This man cannot keep his mouth shut," and asked again that he be removed.  Monteiro said that he would not voluntarily leave and that she would have to have him arrested to have him move.  Id.

A recess was called, after which Monteiro was still sitting in his council chair. Perkins-Auguste again asked the officers to escort Monteiro out of the meeting, but the officers stated that they could not do so unless Monteiro was formally placed under arrest.  Perkins-Auguste then instructed the officers to place Monteiro under arrest and remove him from the meeting.  Id.  She did not follow any council policy, did not consult her fellow councilmembers, and did not attempt to negotiate any compromise before having Monteiro removed.  Id. at 405.  After Monteiro was no longer present, Perkins-Auguste continued her personal attack against him for the benefit of the crowd.  Id. at 402.   Monteiro was subsequently charged with disruption of a public meeting in violation of New Jersey law, but was acquitted of that offense.  Id.

21

Monteiro filed a lawsuit against the city, the police officers, and Perkins-Auguste, alleging claims under 42 U.S.C. § 1983 for violations of his First Amendment, Fourth Amendment, and due process rights.  Perkins-Auguste argued in her motion for summary judgment that she was entitled to qualified immunity on the First Amendment claims.  The district court disagreed, and denied Perkins-Auguste's motion.  Id. at 398. A jury eventually returned a verdict in Monteiro's favor.

The Third Circuit determined that Monteiro adduced sufficient evidence at trial from which a reasonable jury could conclude that Perkins-Auguste acted with a motive to suppress Monteiro's speech based upon his opposition to the budget.

> The jury saw the videotape of the meeting and heard the stridency of Perkins-Auguste's *ad hominem* attack on Monteiro.  While Monteiro was arguably disrupting the proceedings by interrupting her, he was also defending himself from a personal attack.  It was Perkins-Auguste who changed the tone of the meeting from a debate about the merits of the budget to a quasi-prosecutorial forum.
>
> The speed with which she determined to eject Monteiro from the meeting, her failure to consult her fellow council members or to negotiate any compromise, and her failure to follow any established procedure could be viewed by a reasonable jury as evidence that Perkins-Auguste's behavior was emotionally charged and motivated by anger and personal animosity, rather than a desire to maintain smooth operation of the meeting.  Despite the calm in the meeting room after the recess, Perkins-Auguste persisted in having Monteiro removed, in handcuffs, against his will.

Id. at 405.

The Court does not believe the facts presented in <u>Monteiro</u> are in any way similar to the case at bar.  There was no personal attack on any of the Plaintiffs by Mayor Fretti or any Councilmember.  Where the defendant in <u>Monteiro</u> immediately demanded that the plaintiff be removed from the room and made no attempt to come to a compromise about the situation, Mayor Fretti repeatedly asked Plaintiff Rose to relinquish the podium before consulting the Council and requesting that the chambers be cleared.  Also important is the fact that neither Mayor Fretti nor the Council ordered the arrest of Plaintiffs, whereas the defendant in <u>Monteiro</u> clearly did.  The Court does not believe, based on the actual events of the May 5, 2005 meeting as shown on the audio and video recordings provided to the Court, that a fact finder could reasonably conclude that Mayor Fretti's actions were motivated by the content of Plaintiff Rose's speech.

## 2. Narrow tailoring and significant governmental interest

Plaintiffs next argue that assuming Defendants' conduct was content-neutral, their conduct in having Plaintiffs arrested and prosecuted was not narrowly tailored to accomplish the City's interest in continuing the meeting.  The "requirement of narrow tailoring is satisfied 'so long as the...regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" <u>Rock Against Racism</u>, 491 U.S. at 799.

"There is a significant governmental interest in conducting orderly, efficient meetings of public bodies." <u>City of Madison, Joint Sch. Dist. No. 8 v. Wisconsin Employment Relations Comm.</u>, 429 U.S. 167, 175 n. 8, 97 S.Ct. 421 (1976); <u>Jones</u>,

888 F.2d at 1332; Rowe, 358 F.3d at 803.  "A speaker may disrupt a Council meeting by speaking too long, by being unduly repetitious, or by extended discussion of irrelevancies." White v. City of Norwalk, 900 F.2d 1421, 1425 (9th Cir.1990).  "To deny the presiding officer the authority to regulate irrelevant debate and disruptive behavior at a public meeting...would cause such meetings to drag on interminably, and deny others the opportunity to voice their opinions."  Jones, 888 F.2d at 1333.

Contrary to Plaintiffs' argument, a review of the audio and video recordings of the May 5, 2005 meeting shows that Mayor Fretti never ordered the arrest of Plaintiffs.[8] He only instructed the police chief to clear the chambers after repeatedly asking Plaintiff Rose to leave the podium.  Mayor Fretti's actions in requesting that Plaintiff Rose relinquish the podium and then having the chambers cleared were reasonable and served the important governmental interest of conducting an orderly public meeting.  This is especially true in light of the fact that what Plaintiff Rose wanted done, having a non-emergency item added to that night's agenda, would have violated the Council's policies and procedures, and because one Councilmember had already said on the record that he was not prepared to discuss the Park issue that night.

The City's conduct in arresting Plaintiffs was similarly reasonable.  Plaintiffs do not dispute that Commander Fason told Plaintiff Rose that if the group relinquished the podium, then no one would be arrested.  In response, Plaintiff Rose told Commander

_____

[8]The Court also notes that the Mayor did not have the authority to tell Chief Simons to arrest Plaintiffs.  (Dep. of Charles Franklin Simons, III, p. 10).

Fason to "do your job and I'm going to - - we are going to do what we have to do."  It was not until that time that Commander Fason told the crowd he was left with "no other choice than to place you all under arrest," and subsequently led the crowd out of the chambers.  Plaintiffs argue that Defendants' objective of continuing the meeting could have been accomplished by escorting Plaintiffs to the door and out of the chambers, and having them arrested was a means substantially broader than necessary.  This might be the case if Commander Fason had not previously asked Plaintiff Rose, the de facto leader of the group, to relinquish the podium, and had not specifically told Plaintiff Rose that no one would be arrested if he did so.   Plaintiffs chose to ignore the opportunity to leave the chambers in an orderly fashion, the equivalent of being escorted out of the chambers by the police.  It was not unreasonable to arrest Plaintiffs after the police were directly told by Plaintiff Rose that the group would not move from the podium.

The requirement of narrow tailoring does not hinge on the "judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted."  Rock Against Racism, 491 U.S. at 799.  It does not matter if the Court agrees with Mayor Fretti's decision to have the chambers cleared or with the police's decision to arrest Plaintiffs.  That is not the test.  It is also not for the Court to second-guess whether Mayor Fretti should have said that the item would be placed on the next meeting's agenda.   Both the Mayor's and the police officer's actions

25

constituted reasonable means to move the meeting forward so that the Council could complete all of the items on the agenda. "We should not inquire whether we as presiding officers would have handled the matter in the same way." Jones, 888 F.2d at 1334.

Plaintiffs contend that when the Council opened up the floor for comment from the public, the meeting became a public forum, in which the government's power to limit expressive activity is severely curtailed. However, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions 'are justified without reference to the content of the regulated speech,...they are narrowly tailored to serve a significant governmental interest, and...they leave open ample alternative channels for communication of the information.'" Ward, 491 U.S. at 791.

The Court finds that Defendants' actions were still reasonable even under the public forum analysis. Jones, 888 F.2d at 1328. As previously stated, Plaintiffs were not removed from the meeting because of the content of their speech, but because of their disruptive conduct. Defendants' actions served a significant governmental interest, as "the mayor's interest in controlling the agenda and preventing the disruption of the commission meeting [is] sufficiently significant to satisfy [the] governmental interest prong of the analysis." Id. at 1333. The actions were also narrowly tailored to achieve the significant governmental interest of controlling the agenda and preventing

the disruption of the meeting.  Plaintiffs do not argue that there were not ample alternative channels of communication available to them.

Defendants' Motion for Summary Judgment on Plaintiffs' First Amendment claim is granted.

### 2.   Fourth Amendment

#### i.   False Arrest

"A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim."  Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir.2004).  "The existence of probable cause at the time of the arrest, however, constitutes an absolute bar to a section 1983 action for false arrest."  Id.  A warrantless arrest made on the basis of probable cause is legal.  Georgia and federal law have the same standard for determining whether probable cause exists.  See State v. Thurmond, 203 Ga.App. 230, 416 S.E.2d 529 (1992).  The probable cause standard is met "when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  Kingsland, 382 F.3d at 1226 (internal quotations omitted).  The arrest must be objectively reasonable under the totality of the circumstances.  Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir.2002), citing Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir.1998).

Defendants contend that they are entitled to summary judgment on Plaintiffs' false arrest claim because there was adequate probable cause to arrest Plaintiffs for disrupting a public meeting in violation of O.C.G.A. § 16-11-34.  Plaintiffs initially argue that summary judgment on this issue is not proper because there is a disputed issue of fact as to the Defendants' motive in ordering the arrest of Plaintiffs, and that if the decision to arrest Plaintiffs was content-based, the decision was not objectively reasonable, which would mean no probable cause existed for their arrest.

The Supreme Court has established that the subjective intentions of an arresting officer "play no role in ordinary, probable-cause Fourth Amendment analysis."  Whren v. United States, 517 U.S. 806, 813, 116 S.Ct. 1769 (1996).  "Instead, an arrest will be upheld if the objective circumstances justify the arrest."  United States v. Jones, 377 F.3d 1313, 1314 (11th Cir.2004) (per curiam).  Accordingly, the Court rejects Plaintiffs' argument, as Defendants' motives have no relation to the probable cause analysis.

Plaintiffs next contend that Defendants did not have probable cause to arrest them.  The Court disagrees.  The facts then known to the City police officers at the scene were sufficient to establish probable cause to arrest Plaintiffs for disrupting a public meeting under O.C.G.A. § 16-11-34.  Commander Fason heard Mayor Fretti ask Plaintiff Rose to leave the podium and heard Plaintiff Rose say that he was not going to move.  Commander Fason also personally asked Plaintiff Rose to leave so that no arrests would occur.  Plaintiff Rose again refused, telling the officer to do what he had to do.  A reasonably prudent man observing the scene easily could have believed that

in refusing to relinquish the podium, Plaintiff Rose was committing an act reasonably expected to prevent or disrupt a lawful meeting.

The Court does not believe the analysis for the Plaintiffs other than Plaintiff Rose should be any different. Plaintiffs state that there was no probable cause for their arrest because they were not directly asked to leave the chambers and they never said they would not move. After reviewing the videotape of the meeting, it appears clear to the Court that Plaintiff Rose was the de facto leader of the group, and whatever he did, the group would do.[9] In fact, after Plaintiffs approached the podium in support of Plaintiff Rose, he spoke on behalf of the entire group, stating, "We will not move; you do whatever you have to do." In any event, Plaintiffs clearly heard the exchange where Plaintiff Rose was asked to relinquish the podium and his response that he would not move. Plaintiffs' collective actions not only disrupted the meeting, they stopped the meeting. The Court finds that the facts and circumstances within the police officers' knowledge were sufficient to justify their believe that Plaintiffs were committing the offense of disrupting a public meeting.

The fact that O.C.G.A. § 16-11-34 was subsequently declared unconstitutional does not change the Court's analysis. Section 16-11-34 was a valid law when the arrests were made. "Police are charged to enforce laws until and unless they are declared unconstitutional." Michigan v. DeFillippo, 443 U.S. 31, 38, 99 S.Ct. 2627

---

[9]This is supported by the testimony of several Plaintiffs, who said they were going to stand in solidarity with Plaintiff Rose and were not going to move from the podium. (Dep. of Faye Chachere, p. 35; Dep. of Jesse Clark, pp. 31, 34; Dep. of Mary Sherman, p. 20).

(1979). "A prudent officer, in the course of determining whether respondent had committed an offense under all the circumstances shown by this record, should not have been required to anticipate that a court would later hold the ordinance unconstitutional." Id. at 37.

Defendants' Motion for Summary Judgment on Plaintiffs' § 1983 false arrest claim is granted.

### ii.    Malicious Prosecution

The Eleventh Circuit has identified malicious prosecution as a viable constitutional tort under 42 U.S.C. § 1983.  Wood v. Kesler, 323 F.3d 872, 881 (11th Cir.2003).  To prove a § 1983 malicious prosecution claim, under Georgia law and federal law, a plaintiff must show the following:  "(1) a criminal prosecution instituted or continued by the present defendant; (2) with malice and without probable cause; (3) that terminated in the plaintiff accused's favor; and (4) caused damage to the plaintiff accused." Kjellsen v. Mills, 517 F.3d 1232, 1237 (11th Cir.2008), *quoting* Wood, 323 F.3d at 881-882.

As discussed in section A(2)(i) *supra*, there was probable cause to arrest Plaintiffs.  Because lack of probable cause is a required element to prove a § 1983 claim for malicious prosecution in violation of the Constitution, the existence of probable cause in this case defeats the claim.  *See* id.  Accordingly, Defendants' Motion for Summary Judgment on Plaintiffs' malicious prosecution claim is granted.

### iii.    False Imprisonment

"A false imprisonment claim under [§] 1983 is based on the protection of the Fourteenth Amendment against deprivations of liberty without due process of law." Ortega v. Christian, 85 F.3d 1521, 1526 (11th Cir.1996).   To establish a false imprisonment claim under § 1983, a plaintiff must prove "(1) intent to confine, (2) acts resulting in confinement, and (3) consciousness of the victim of confinement or resulting harm," Id. at 1526 n. 2, and that the imprisonment worked a violation of Fourteenth Amendment due process rights.   Cannon v. Macon County, 1 F.3d 1558, 1563, *citing* Douthit v. Jones, 619 F.2d 527 (5th Cir.1980).

Like the false arrest and malicious prosecution claims, Plaintiffs' false imprisonment claim hinges on whether probable cause existed at the time Plaintiffs were arrested.  If a police officer has probable cause to make an arrest, the arrestee may not sue for false imprisonment under § 1983 based on a detention pursuant to that arrest.  Atterbury v. City of Miami Police Dep't, No. 08-15519, 2009 WL 868014 at *3 (11th Cir. Apr. 2, 2009).  Based on the conclusion that Defendants had actual probable cause to arrest Plaintiffs, the absence of a constitutional violation forecloses Plaintiffs' claim of false imprisonment.   Defendants are entitled to summary judgment on Plaintiffs' false imprisonment claims.

### 3.    Fourteenth Amendment Due Process Rights

The Due Process Clause of the Fourteenth Amendment provides the guarantee of fair procedures, prohibiting the deprivation of life, liberty, or property by a State

without due process of law.  Under the rubric of substantive due process, it "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them.'" Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061 (1992), *quoting* Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662 (1986).

Plaintiffs contend that Defendants' conduct in arresting and prosecuting them violated Plaintiffs' substantive due process rights by unlawfully infringing on their First Amendment rights.[10]  Plaintiffs rely heavily on Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680 (1963), to support their position.

In Edwards, 187 students marched to the grounds of the South Carolina state capitol to protest discrimination.  The group marched around the grounds for approximately 45 minutes, and "[a]s they entered, they were told by the law enforcement officials that 'they had a right, as a citizen, to go through the State House grounds, as any other citizen has, as long as they were peaceful.'" Id. at 230.  Between 200 and 300 spectators gathered to watch the march.  "Nobody among the crowd actually caused or threatened any trouble," Id. at 231, and there was no obstruction of traffic, though a police officer was dispatched to keep traffic moving at a nearby

---

[10]It appears from Plaintiffs' Response to Defendants' Motion for Summary Judgment that Plaintiffs are alleging only a substantive due process claim.  As Plaintiffs do not specify in their Complaint whether they are making a procedural or substantive due process claim, and do not argue that there was a procedural due process violation in their Response, the Court will only consider the substantive due process claim.

intersection.  Id. at 231-232.  The police then advised the group that there would be arrests unless they dispersed within 15 minutes.  Id. at 233.

Instead of dispersing, the protesters engaged in what was described as "boisterous," "loud," and "flamboyant" conduct, which consisted of loudly singing songs, stamping their feet and clapping their hands, and a "religious harangue" by one of their leaders.  After 15 minutes had passed, the police arrested the petitioners and took them to jail.  Id. at 233.  The petitioners were convicted of violating a state breach of the peace statute.

The Supreme Court reversed the convictions, holding that the peaceful march and demonstration was protected by the rights of free speech, free assembly, and freedom to petition for a redress of grievances.  Id. at 235.  The convictions were held to be unconstitutional because the arrests were based only on the protestors' expression of unpopular views.  Id. at 236-237 ("And they were convicted upon evidence which showed no more than that the opinions which they were peaceably expressing were sufficiently opposed to the views of the majority of the community to attract a crowd and necessitate police protection.")

It appears to the Court that the Supreme Court's holding in Edwards served to invalidate a statute which was aimed at and employed for the purpose of inhibiting "the peaceful expression of unpopular views."  This distinguishes Edwards from the case at bar.  There is no evidence that O.C.G.A. § 16-11-34 was meant to restrict the expression of views, either popular or unpopular, and the Court has held *supra* that

Defendants' actions were not taken to restrict Plaintiffs' views.  Thus, the Court is not persuaded by Edwards that Plaintiffs' due process rights were violated by Defendants' actions.  *See also* People v. Turner, 265 N.Y.S.2d 841 (1965).

In any event, there is another basis on which the Court has determined that there has been no violation of Plaintiffs' substantive due process rights.  "If an Amendment provides an explicit textual source of constitutional protection against the sort of conduct complained of, that Amendment - - not the more generalized notion of substantive due process under the Fourteenth Amendment - - is the guide for analyzing the claim."  Jordan v. Mosley, 298 Fed.Appx. 803, 805 (11th Cir.2008); *see also* Graham v. Connor, 490 U.S. 386, 394, 109 S.Ct. 1865 (1989).  Here, Plaintiffs' claim is premised on an alleged unlawful arrest.  Under Graham and Albright v. Oliver, 510 U.S. 266, 114 S.Ct. 807 (1994), Plaintiffs' claim should be analyzed under the Fourth Amendment, not the Due Process Clause of the Fourteenth Amendment.  As the Court has previously determined, no Fourth Amendment violation occurred here because probable cause existed for Plaintiffs' arrest.

The same applies to Plaintiffs' First Amendment claim.  "[I]f a more specific constitutional provision applies, then [Plaintiffs] cannot resort to substantive due process."  Jordan, 298 Fed.Appx. at 806; Graham, 490 U.S. at 394.  As with the Fourth Amendment, the Court has found no violation of Plaintiffs' First Amendment rights. While Plaintiffs argue that under McKinney v. Pate, 20 F.3d 1550 (11th Cir.1994), decided after Graham and Albright, their substantive due process claim should be

considered as a separate cause of action, the recent case of <u>Jordan v. Mosley</u>, 298 Fed.Appx. at 803, shows that this Circuit still follows <u>Graham</u> and <u>Albright</u>, meaning that the Court cannot consider Plaintiffs' due process claim separate and apart from the alleged constitutional violations.

Defendants are entitled to summary judgment on Plaintiffs' Fourteenth Amendment due process claim.

### 4.    Qualified Immunity

Defendants argue that Mayor Fretti is cloaked with qualified immunity for his actions in authorizing the police to clear the Council chambers.  Plaintiffs contend that the law was clearly established so as to give Defendants fair warning that their arrest, incarceration, and prosecution of Plaintiffs was unlawful and actionable.  At a minimum, Plaintiffs argue that the issue of qualified immunity should be resolved by the jury, rather than by the Court.

Government officials performing discretionary functions are generally immune from liability for civil damages so long as their actions do not violate clearly established statutory or constitutional rights of which a reasonable person would have known. <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982).  Resolving the issue requires a two-part inquiry:  (1) Do the facts alleged, taken in the light most favorable to the party asserting the injury, show the [official's] conduct violated a constitutional right? and (2) If a violation could be made out on a favorable view of the parties'

submissions, was the right clearly established?  Saucier v. Katz, 533 U.S. 194, 201, 121 S.Ct. 2151 (2001).

The Court does not believe it is necessary to decide the second part of the Saucier test because Plaintiffs do not survive the first prong of the test.  Because no constitutional violations occurred, Mayor Fretti is entitled to qualified immunity on the claims arising from the May 5, 2005 meeting insofar as the claims are brought against him in his individual capacity.

### 5.     Liability of the City of Valdosta

A municipality may be held liable under § 1983 if the plaintiff shows that a "custom" or "policy" of the municipality was the "moving force" behind the constitutional deprivation.  Monell v. Dep't of Social Services of New York, 436 U.S. 658, 690-694, 98 S.Ct. 2018 (1978).  A municipality may not be held liable on the basis of respondeat superior.  Brown v. City of Fort Lauderdale, 923 F.2d 1474, 1479 (11th Cir.1991).  Thus, "recovery from a municipality is limited to acts that are, properly speaking, acts 'of the municipality' - that is, acts which the municipality has officially sanctioned or ordered."  Id., *quoting* Pembaur v. Cincinnati, 475 U.S. 469, 480, 106 S.Ct. 1292 (1986).  Liability may also be based on a custom, which is a practice that is so settled and permanent that it takes on the force of law.  Monell, 436 U.S. at 690-691.

Plaintiffs do not argue that the City has a custom of violating citizens' First Amendment rights, and there is no evidence in the record to support such a finding. Instead, Plaintiffs contend that their rights were violated by a policy decision initiated

by Mayor Fretti, and expressly ratified and approved by the Council, to direct the police chief to arrest Plaintiffs.

Assuming *arguendo* that Mayor Fretti and the Council are final policymaking officials, Plaintiffs still cannot survive summary judgment.  Plaintiffs have failed to show that either the Mayor or the Council caused the alleged constitutional deprivation.  The problem with Plaintiffs' position is that Mayor Fretti did not order, and the Council did not approve, the arrest of Plaintiffs.  Mayor Fretti stated at the May 5th meeting that "[i]t is unanimous that we allow Chief Simons to, see fit necessary, as he deems, to help us clear the chamber so we can continue with our agenda."  In the Court's view, this statement does not equal a direction to the police chief to arrest Plaintiffs.  At any rate, the Mayor and Council did not have the power to order Chief Simons to arrest Plaintiffs or anyone else.  If the Mayor and the Council did not cause the alleged constitutional violation, the municipality cannot be held liable under § 1983.  *See* McMillian v. Monroe County, 520 U.S. 781, 785-786, 117 S.Ct. 1734 (1997).  Consequently, summary judgment is granted on Plaintiffs' claims against the City.

## B.    State Law Claims

Plaintiffs' Complaint also alleges state law claims for false arrest, false imprisonment, malicious prosecution, and tortious misconduct.  The Court has supplemental jurisdiction over these state law claims. 28 U.S.C. § 1367. Having found that Defendants are entitled to summary judgment on Plaintiffs' federal claims, the Court declines to exercise jurisdiction to resolve Plaintiffs' state law claims.  *See* 28

U.S.C. § 1367(c) (indicating that a court may decline to exercise supplemental jurisdiction if it has dismissed all claims under which it has original jurisdiction).

## V.   CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (Doc. 14) is granted as to Plaintiffs' federal claims, and judgment shall be entered in favor of Defendants.   The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.   Consequently, those claims are dismissed without prejudice.

**SO ORDERED**, this the 15th day of April, 2009.


*s/   Hugh Lawson*
**HUGH LAWSON, SENIOR JUDGE**

mbh